UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MINDY SLATER,

        Plaintiff,

v.                                             Case No. 8:09-cv-208-T-24EAJ

PROGRESS ENERGY SERVICE
COMPANY, LLC, and FLORIDA
POWER CORPORATION,

        Defendants.
_____/

## ORDER

      This cause comes before the Court on cross motions for summary judgment.  (Dkt. 59,

60, 61, 62, 63, 64, 65, 68, 69, 70, 79, 87, 88, 91, 92, 93.)    In this case, Plaintiff Mindy Slater, a

former employee of Defendants Progress Energy Service Company, LLC ("Progress Energy")

and Florida Power Corporation ("Florida Power"), alleges that the defendants terminated her

employment because of her pregnancy and because she allegedly complained of discrimination,

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., the Florida

Civil Rights Act, Fla. Stat. § 760.01, *et seq.*, and the Florida Whistleblower Protection Act, Fla.

Stat. § 448.101, *et seq.*  As explained below, the undisputed evidence shows that Slater cannot

prevail on her claims as a matter of law.

## I.     Background and Facts

      In 2006, Slater was working as a temporary contract laborer at Progress Energy's nuclear

plant in Crystal River, Florida, when she learned of an opening in Progress Energy's

Occupational Health unit.  That unit is responsible for conducting medical screening for

employees, contractors, and applicants to determine whether they are medically qualified to hold

certain positions.  This medical screening is conducted for safety purposes to ensure the

individuals are physically fit to perform their duties.  The medical screening tests vary with the

position, as each position has different qualifications.

Slater sent her resume to LaDonna Overcash, the supervisor of Occupational Health unit,

who was located in Raleigh, North Carolina, to apply for the position as a receptionist in that

unit.  Overcash interviewed Slater, and then offered her the position in May 2006.  The position

was contracted through Energy Services Group, International ("ESGI").[1]  Slater would be paid

by ESGI, and would report to Overcash.

A.      Slater's Position in the Occupational Health Unit

Slater began working as a receptionist in the Occupational Health unit on May 19, 2006.

At the time she started her assignment, Slater and a registered nurse, Tena Kastner, were the only

individuals assigned to the Occupational Health unit at the Crystal River plant.  As a

receptionist, Slater answered the phone, scheduled employee physicals, and copied medical

records to microfilm.

Nurses and medical assistants at the Occupational Health unit were responsible for

performing physicals of prospective and current employees.  A physical consisted of the clinical

screening tests required to establish the specific medical qualifications of the position.

Depending on the position, it could include blood pressure screening, vision screening,

---

[1]ESGI was formerly named as a defendant in this lawsuit.  Slater's claims against ESGI
were dismissed without prejudice on April 15, 2009.  The Clerk entered judgment under Rule
54(b) in favor of ESGI on June 29, 2009.  Slater's appeal of the order and judgment is still
pending.

audiological examinations, blood work to check the individual's blood count and chemistry, and electrocardiograms.  The nurses were responsible for reviewing the test results and other paperwork to ensure that the tests were performed correctly before providing them to the doctor, who would then determine whether the individual was qualified for the position.  A second review was performed on every physical to ensure that it was completed correctly, before providing it to the doctor.

After working as a receptionist for about a month, Overcash asked Slater if she wanted to assist with the employee physicals.  Slater had a medical background and was certified as a phlebotomist.  She testified that she believed she was hired into the Occupational Health unit because of her medical background, which would allow her to move into this role.  In fact, at the time she hired Slater, Overcash was looking for someone with clinical skills because Kastner was the only nurse in the unit.  Slater agreed to accept the new duties and the title change to Healthcare Technician.

Once Slater became a Healthcare Technician, she would perform the tests, including the vision and hearing tests, as well as draw blood.  Kastner trained Slater on the different components of each physical.  Kastner showed Slater what needed to be done for each test, watched her administer the tests, and administered the tests with her until she felt that Slater was competent to do it independently.  In particular, Kastner trained Slater on how to use the vision–testing machine, known as the titmus.  Kastner spent about five to ten minutes explaining the machine to Slater; but she never warned Slater about the ways an individual could cheat on a vision exam.

**B.      Slater's Announcement of Her Pregnancy**

On January 26, 2007, via telephone, Slater informed Overcash that she was pregnant.  At this time, she also told Krista Dresbach, who had been hired earlier that month as a second registered nurse for the Occupational Health unit, of her pregnancy.

Slater's announcement of her pregnancy marked the turning point in her relationship with Overcash.  After the announcement, when Overcash would visit the unit, she "would start closing her door more," and Slater believed that she "was left out of the loop with everything." Slater perceived that "things started changing" and she "started getting bad vibes from the office."

Slater's relationship with Kastner also changed.  Previously, Slater and Kastner talked and joked; but, after she announced her pregnancy, Kastner started closing her door more frequently and had lengthy telephone conversations with Overcash.  Slater was excluded from those conversations.

**C.      Counseling of Slater for Job Performance**

On February 12, 2007, Overcash sent an email to Slater outlining work policies and her expectations for Slater's performance.  That email states:

> As discussed, please place your time on the weekly calendar in a manner that is easy to read.  Charge nurses at the sites will validate time worked for contract staff.  Lunches should be taken as discussed and also placed on the calendar.  This is a time for personal phone calls received and made along with taking the time you need to eat.  As discussed also, I would like for your hours to be more routine and reliable as far as consistency on a daily basis.  Please continue to look to the charge nurse for direction in daily work assignments.

Before this email, Slater had not been counseled or disciplined regarding her performance, her personal phone calls, or her lunches.  However, Slater testified that, on two occasions, Kastner

4

had talked to her about her absences, stating that Slater needed to "quit missing so much work." Slater admitted that she had a lot going on in her life, and that she would receive personal calls at work. However, once she received Overcash's email, Slater agreed that she would limit her personal phone calls to her lunch break.

In addition to sending this email, on the same day, Overcash also emailed Jennifer Talley, who was the program manager at Guidant Group (formerly Comensura).[2] Overcash told Talley that Slater frequently missed work, took too many personal phone calls, was not working a full eight hour day or a consistent schedule, and was not focused on her job due to distractions. Overcash acknowledged that Slater "does good work" and "has great interpersonal skills." However, Overcash's February 12, 2007 email to Slater was a warning that "[i]f things don't improve, [Overcash] will want to terminate [Slater's] contract." Overcash provided Talley with specific expectations, including that Slater work eight hours per day, take a 30 minute lunch, work five days a week, return personal calls on her lunch break, be consistent and dependable, and be focused on her job while she was at work. Talley provided this information to Vicki O'Neal O'Dell, Human Resource Manager at ESGI.

The following day, on February 13, 2007, O'Dell counseled Slater via telephone on these issues. After their counseling session, O'Dell reported to Talley, via email, that Slater was "a little surprised, but agreeable and willing to make changes." Slater admitted to O'Dell that she had personal and medical issues that had been resolved and apologized if those issues affected Progress Energy. O'Dell also indicated that Slater would try to schedule her monthly doctor's

---

[2]Guidant Group is the third-party administrator for the staffing companies, including ESGI. It was Tally's job to communicate issues regarding staffing company employees to the staffing company so that they could be resolved.

appointments at the most convenient time, would note them on the calendar, and would provide those dates to O'Dell.  Finally, Slater agreed to limit her personal calls to lunch and agreed to make any other changes to keep Overcash happy.  Slater later testified that during this counseling session with O'Dell, she told O'Dell that she thought her "pregnancy was causing an issue."  O'Dell responded that she did not think the pregnancy was an issue, and reiterated her position when Slater raised it again after her termination.

A few hours after O'Dell sent the email to Talley, Slater sent an email to Overcash, confirming that she spoke to O'Dell and relayed most of the same information that O'Dell had told Talley.  She informed Overcash that her doctor's appointments would be at 3:00 p.m., and she agreed to note that time on the calendar as Overcash requested.  She then assured Overcash that her pregnancy "should not cause [her] any problems while working here."  Slater later testified that she wrote this email in response to Overcash's request that she schedule her doctor's appointments after work hours if possible.

After Slater sent the email to Overcash on February 13, 2007, Overcash called Slater. Slater reported to Overcash that it was not possible to for her to get an appointment after work hours, to which Overcash responded that she wanted Slater "to slow down on emergencies and take more planned time off."  Slater testified that Overcash's statement meant that Overcash wanted her to take more planned time off and have fewer instances where she could not come in, or had to leave early without notice, due to illness or the illness of her children.

Once Slater received the February 12, 2007 email from Overcash, Slater later went to see Geraldine Harris, a senior human resources representative at the Progress Energy plant in Crystal River, Florida.  Slater told Harris that she thought she was being discriminated against because

of her pregnancy.  Harris responded that she could not help Slater because she was not the human resources manager assigned to support the Occupational Health unit.  Harris suggested that Slater contact Overcash, and this is when Slater sent the February 13, 2007 email to Overcash.

### D.       Examination of the Crane Operator Applicant

On February 14, 2007, an applicant visited the Occupational Health unit for a crane operator physical.  As part of the physical, the applicant was required to undergo a vision screening test, which consisted of testing his vision for distance, peripheral, depth, and color.  To qualify for the position of crane operator, the applicant must have vision in both eyes as well as peripheral vision.

Before submitting to the vision screening test, the applicant filled out a three-page medical history form in which he answered "yes," to the question, "Have you ever lost vision in either eye (temporarily or permanently)?," and indicated that the vision loss was permanent.  To elaborate his answer, the applicant wrote, "1984 – Loss of right eye   Farming accident – eye removed."  When asked if he had any physical limitations or restrictions, the application answered "yes," and indicated on the form that he was limited or restricted in his vision.

Slater completed the vision exam on this applicant.  She recalled that the applicant's paperwork showed that he had an eye injury from a farming accident.  However, Slater did not ask him any questions about the injury.  She took him back to the titmus machine and administered the examination.  She recalled that he was able to read everything in the machine and achieved a passing grade.  Specifically, she testified, "I just read the numbers that he read to me."

After the exam, Slater completed the paperwork, noting that the applicant "denies any physical restrictions or limitation," that the applicant had 20/20 vision in both eyes, and that the applicant had a field of vision in both eyes of 85 degrees.  Slater then provided the paperwork to the nurses.

Dresbach completed the second review on this physical and the paperwork.  Dresbach did not understand how the applicant could have any vision in his right eye, as his paperwork indicated that he had his eye removed.[3]  When Dresbach asked Slater to explain this, Slater responded that she "didn't think to ask him" about the eye injury, and that she "[didn't] know what the eye injury was."  She explained, "He just wrote 'eye injury.'  And, I just didn't think to ask him.  I mean, his eye looked very real."

By the time Slater provided the paperwork to the nurses, the applicant had left the unit.  So, Dresbach called the applicant and asked him to return to the unit to be re-examined.   When the applicant returned, he admitted that, during the first examination that Slater conducted, he had tilted his head so that he could use his left eye to complete the test.  Dresbach informed him that this was not permitted.  After he was re-examined, the doctor ultimately concluded that the applicant was disqualified from the crane operator position because he had no vision in his right

_____

[3]The parties dispute when it was that Slater and the nurses first learned that the applicant had a false eye.  Defendants contend that the applicant indicated on the medical form that he had a false right eye.  Slater, however, disputes this, and contends that they did not learn this fact until Dresbach called the applicant to ask him to return for re-testing.  At the summary judgment stage, the Court resolves all issues of material fact in favor of the plaintiff.  *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  The Court, therefore, assumes for purposes of summary judgment, that although the applicant indicated that he had "permanent[]" vision loss, that he had "los[t] [his] right eye," and that he had his "eye removed," the applicant did not indicate on the form the additional fact that he has a false, or enucleated, right eye.  The Court assumes that the parties did not learn of the false right eye until sometime after Slater completed the medical examination and provided the paperwork to the nurses.

8

eye.

After this incident, Overcash instructed Kastner to observe Slater performing medical tests in order to determine whether she possessed the correct technique and skill.  Slater accurately performed these tests, and Kastner reported that to Overcash.

### E.      Slater's Termination

Slater's contract assignment at Progress Energy ended on February 21, 2007, and she was terminated by ESGI on that same date.  On that date, Overcash contacted O'Dell and requested that Slater's contract assignment be terminated "due to performance concerns, one recent that was critical in nature."  O'Dell informed Slater of Overcash's decision and the termination of her employment by ESGI.

## II.      Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Id.*

When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.  *Id.*  In determining whether there is a "genuine" issue, the inquiry is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52,

106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## III.  Discussion

### A.       Count I: Pregnancy Discrimination under Title VII and the FCRA

In Count I of her Complaint, Slater contends that she was discriminated against on the

basis of her pregnancy in violation of Title VII and the FCRA.  Specifically, Slater contends that

she was subjected to a different application of the work rules based on her pregnancy, and was

ultimately terminated.  Slater, however, cannot establish a prima facie case of discrimination, or

that the defendants' legitimate, non-discriminatory reasons for terminating her contract

assignment were pretext to mask unlawful discrimination.

Title VII, as amended by the Pregnancy Discrimination Act, makes it unlawful for an

employer to discriminate against an employee "because of or on the basis of pregnancy,

childbirth, or related medical conditions."  42 U.S.C. § 2000e(k); *Armindo v. Padlocker, Inc.*,

209 F.3d 1319, 1320 (11th Cir. 2000).  To evaluate a pregnancy discrimination claim supported

by circumstantial evidence, the Court uses the traditional *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), burden-shifting analysis.  Under this

framework, the plaintiff must raise an inference of discrimination by establishing a prima facie

case of discrimination.  *Id.* at 802, 93 S. Ct. at 1824.  The burden then shifts to the defendants to

"articulate some legitimate nondiscriminatory reason" for the alleged discrimination.  *Id.*  Once

the defendants produce such a reason, the plaintiff must then prove that the legitimate reason was

a mere pretext for discrimination.  *Id.* at 804, 93 S. Ct. at 1826.  To avoid summary judgment,

10

the plaintiff must produce sufficient evidence to show "that the employer intentionally discriminated against [her] because of [her] [pregnancy]." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (per curiam).

### 1. Slater cannot establish a prima facie case of pregnancy discrimination.

To establish a prima facie case of pregnancy discrimination under Title VII and the FCRA, Slater must establish that she: "(1) was a member of a protected class, (2) was qualified for the job she held, (3) suffered an adverse employment action, and (4) suffered from a differential application of work or disciplinary rules." *Sampath v. Immucor, Inc.*, 271 Fed. Appx. 955, 960 n.5 (11th Cir. 2008).  Here, the defendants contend that Slater cannot establish the last prong of her prima facie case.

To determine whether the plaintiff suffered from a differential application of work or disciplinary rules, the Court evaluates "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotations and citations omitted).  The comparators must be "similarly situated in all relevant respects." *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th C ir. 2003) (quotations and citations omitted).  "[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing applies with oranges." *Burke-Fowler*, 447 F.3d at 1323 (quotations and citations omitted).  In the disciplinary context, the most important factors are "the nature of the offenses committed and the nature of the punishments imposed." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2006).

Slater has not established a prima facie case of discrimination because she has failed to

11

show that a similarly-situated employee was disciplined differently.  Slater contends that Mary

Bennett, a former administrative assistant in the Occupational Health unit, was similarly situated

and treated more favorably.[4]  Slater was hired to fill the vacancy that was created when Bennett

took a position in a different part of the plant.  Slater and Bennett performed similar job duties in

that they both answered the phone, handled medical files, and performed certain portions of the

physicals.

Slater, however, has not presented any evidence–beyond her own speculation–that she

was "held to a higher standard" than Bennett.  There is no record evidence that Bennett engaged

in any misconduct, or committed any mistakes, and was not disciplined.  The vague accusation

that Bennett made "mistakes," or that everybody makes mistakes, without establishing the

specific type of mistake, and that it was similar to the error the defendants believed Slater

made–reporting that the crane operator applicant, who had no right eye, had normal vision in

both eyes–is insufficient to meet her burden.[5]  Accordingly, the defendants are entitled to

---

[4]Slater also identified Lois Reed as a comparator in her interrogatory answers.  Reed, however, is not similarly situated to Slater because she was not hired to perform, and did not perform, any medical testing.  The record shows that Reed performed only clerical and administrative duties.  Moreover, there is no record evidence that Reed committed any mistakes in the performance of her duties–much less a mistake similar in magnitude to the mistake that the defendants believed Slater committed.

[5]Slater suggests that the crane operator applicant previously was medically cleared to operate a crane, and that Bennett was the receptionist at the time that occurred.  The Court, in fact, reopened discovery in April 2010 so that Slater could investigate further into this issue. Ultimately, however, Slater was unable to discover, and file with the Court, evidence to support the contention that Bennett previously cleared the same applicant for a crane operator position, that Overcash was aware of this mistake (regardless of who committed the mistake), or that Overcash did not take any disciplinary action against the employee, despite the mistake. Accordingly, Slater's suggestion that Bennett previously made the same mistake that Slater was later terminated for making is not established in the record and does not support a prima facie case of discrimination.

summary judgment because Slater has not established a valid comparator, and thus has not met

her burden of establishing a prima facie case of discrimination.

> **2.      Slater cannot establish that the defendants' nondiscriminatory reason
> for her termination was pretextual.**

Even assuming that Slater established a prima facie case of pregnancy discrimination, she

has failed to present any evidence that the defendants' legitimate, nondiscriminatory reason for

terminating her contract assignment was pretextual.  "A plaintiff may show pretext either by

directly persuading the court a discriminatory reason motivated the defendant, or by indirectly

showing the employer's proffered explanation is unworthy of credence." *Johnson v. Switch &*

*Data Mgmt. Co., LLC*, 199 Fed. Appx. 834, 835 (11th Cir. 2006).  The relevant question is

whether the proffered reason is a cover-up for discrimination. *Id.*  In determining whether the

plaintiff has established pretext, "[a] plaintiff is not allowed to recast an employer's proffered

nondiscriminatory reasons or substitute his business judgment for that of the employer."

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  "Provided that the proffered

reason is one that might motivate a reasonable employer, an employee must meet that reason

head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of

that reason." *Id.*

It is undisputed that Overcash was the sole decision-maker who made the decision to

terminate Slater's assignment at Progress Energy.  Therefore, Slater can meet her burden of

showing pretext if she can show "some reasonable basis in the evidence for finding that"

Overcash did not believe that she had committed a critical error in the examination of the crane

operator applicant. *Silvera*, 244 F.3d at 1260.  The issue is not whether Slater actually

committed an error, but whether Overcash believed that Slater did, and believed that her error

warranted termination.  Indeed, an "employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a

discriminatory reason.  *Nix v. WLCY Radio/Rahall Commc'ns.*, 738 F.2d 1181, 1187 (11th Cir.

1984).

 Slater contends that the fact that there was no documentation of problems with her

performance before she announced her pregnancy is evidence of pretext.   However, the record

does not support this contention.  To the contrary, Slater testified at her deposition that Kastner

spoke to her twice about her absences, before Slater announced that she was pregnant.  In

addition, Slater does not dispute that she actually committed the performance deficiencies about

which she was counseled, including absences from work and personal calls.

Slater further attempts to establish pretext by disputing her responsibility for the error

made during the crane operator applicant's examination.  In her declaration, Slater suggests that,

by holding her responsible for this error, the defendants were making her responsible for delving

into the medical record and understanding what impact an individual's medical history would

have on a vision exam.  However, there is no evidence that Slater was terminated because she

failed to evaluate or delve into the applicant's medical history.  Rather, the record shows that the

applicant's form revealed that he did not have an eye; yet, Slater reported he had perfect vision.

Thereafter, Slater was terminated for performance concerns, particularly the "critical" error of

reporting that the crane operator applicant had normal vision in both eyes, when he had no vision

in his right eye.

The Court cannot second-guess the defendants' business judgment.  The record is

undisputed that Overcash believed that Slater made an error with the crane operator applicant,

and that such an error was critical in nature.  Slater has not presented any evidence to contradict or rebut this belief.  Thus, even if Overcash was wrong, her mistake would not establish pretext.[6]

Finally, Slater contends that the defendants violated their progressive discipline policy in terminating her contract assignment.  There is no evidence to support this contention.  To the contrary, the defendants presented evidence that Slater's termination was not a violation of the progressive discipline policy, as this policy provides that levels of discipline may be skipped for serious offenses.  Slater's mere allegation that the policy was violated is insufficient to establish pretext.  "To survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's preferred reason is mere pretext.  Mere conclusory allegations and assertions will not suffice." *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

In summary, Slater has not established pretext in this case.  The undisputed record shows that Slater reported that the crane operator had normal vision in an eye that had been removed.  Overcash believed that this was a critical error that warranted termination.  There is no evidence that another employee committed an error of the same magnitude, but was disciplined differently.  Slater has not provided any evidence, beyond her own speculation, that the defendants' proffered reason for her termination was pretextual or that she was the victim of

---

[6]Slater also speculates that the applicant's medical form was altered to make her error appear obvious, and she attempts to create a dispute of fact over whether the form indicated that the applicant had a false eye.  What is not disputed, however, is the fact that the applicant indicated on the form that he had permanent vision loss, that he lost his right eye in a farming accident, and that his eye had been removed.   Thus, it is immaterial whether the form indicated the additional fact that the applicant had a false eye.  Additionally, Slater has not provided any evidence–beyond her own self-serving speculation–of intentional or bad faith destruction of, or alteration of, relevant documents.

15

intentional discrimination.  Accordingly, the defendants are entitled to summary judgment.

**B.**     **Count II: Retaliation under the Florida Whistleblower Act**

In Count II of her Complaint, Slater contends that the defendants retaliated against her in violation of the Florida Whistleblower Protection Act ("FWPA").  Specifically, Slater contends that the defendants took retaliatory personnel action against her, including terminating her employment, because of her legitimate objections to the defendant's unlawful employment practices.  Slater, however, cannot establish that she engaged in a protected activity, or that there was a causal link between the adverse employment action and the protected activity, and therefore cannot establish a prima facie case of retaliation.  Furthermore, she cannot establish pretext.

**1.**     **Slater cannot establish a prima facie case of retaliation.**

To state a prima facie case of retaliation under the FWPA, Slater must show that she engaged in a protected activity, that she suffered an adverse employment action, and that there is a causal link between the two.  *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006).  To establish that she engaged in a protected activity under the FWPA, Slater must show that she objected to a policy, practice, or activity by the defendants that actually violated a law, rule, or regulation.  *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1338-39 (M.D. Fla. 2005).

The Court has had a difficult time evaluating Slater's retaliation claim, as her argument is replete with rambling, convoluted sentences, devoid of caselaw and record citations, and terribly brief.  However, to the best the Court can discern, Slater relies on her statement to Overcash, in her February 13, 2007 email, that her pregnancy "should not cause [her] any problems," as her objection to a policy, practice, or activity by the defendants that violated the law.  Such a

statement, however, is too vague and does not include any objection to a violation of law, and therefore does not qualify as a protected activity. *Bicknell v. City of St. Petersburg*, No. 8:03-cv1405-T-27MAP, 2006 U.S. Dist. LEXIS 8789, at *24-25 (M.D. Fla. Mar. 6, 2006) ("Complaints or grievances made in the absence of some allegation of conduct proscribed by Title VII do not constitute statutorily protected activity.") (citing *Coutu v. Martin County Bd. of County Comm'rs.*, 47 F.3d 1068, 1074-75 (11th Cir. 1995) (noting that allegations of "unfair treatment," absent some harassment or discrimination, is not an unlawful employment practice).

Even assuming that Slater could establish that she engaged in a protected activity, she still failed to establish a prima facie case because she has not shown a causal link between the adverse employment action and the protected activity. "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection. *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). However, there is an exception to this rule that applies when "there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.*

What is fatal to Slater's claim is the fact that there is no record evidence that Overcash knew that she complained of pregnancy discrimination. Slater complained to Harris that she thought she was being discriminated against because of her pregnancy, and complained to O'Dell that she thought her "pregnancy was causing an issue." However, there is no evidence to rebut Overcash's statement that neither Harris nor O'Dell informed her that Slater had complained. For this reason alone, Slater cannot establish a causal link. *See id.*

Slater's retaliation claim fails for the additional reason that she did not make these complaints to Harris and O'Dell until after Overcash was contemplating terminating Slater.  In her February 12, 2007 email to Talley, Overcash stated that if Slater's performance did not improve, she would want to terminate Slater's contract.  It was not until the following day, in a counseling session with O'Dell that Slater complained that she thought her pregnancy was causing an issue.  Furthermore, Slater complained to Harris of pregnancy discrimination after she received Overcash's February 12, 2007 email, explaining Overcash's expectations regarding her performance.  "[W]hen an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."  *Drago*, 453 F.3d at 1303, 1308.  Accordingly, the defendants are entitled to summary judgment because Slater has not met her burden of establishing a prima facie case of retaliation.

> **2.      Slater cannot establish that the defendants' nondiscriminatory reason for her termination was pretextual.**

Even if Slater was able to establish a prima facie case of retaliation, the defendants are entitled to summary judgment on this claim because Slater has not established that their legitimate, non-discriminatory reasons for terminating her contract assignment were pretext to mask unlawful retaliation.  As explained above, Slater has not pointed to any evidence that the defendants were motivated by a discriminatory reason to terminate her employment, or that their reason for her termination is unbelievable.  *Johnson*, 199 Fed. Appx. at 835.  Accordingly, the defendants are entitled to summary judgment on the retaliation claim.

18

### C.    Slater's Dispositive Motion for Partial Summary Judgment

Slater moved for partial summary judgment as to the defense asserted in the defendants' Answer that Slater was an independent contractor, and not an employee within the meaning of Title VII, the FCRA, and the FWPA.  (Dkt. 59).   The defendants are not contesting the applicability of the statutes in this case.  Nevertheless, this motion must be **DENIED AS MOOT** because, as explained above, Slater cannot prevail on the merits of her discrimination and retaliation claims.

## IV.    Conclusion

In conclusion, viewing the entirety of the record in the light most favorable to Slater, there are no genuine issues of material fact as to her claims of discrimination and retaliation. Accordingly, the defendants' Motion for Summary Judgment (Dkt. 60) is **GRANTED** in its entirety, and Slater's Motion for Partial Summary Judgment (Dkt. 59) is **DENIED AS MOOT**. The Clerk is directed to enter judgment in favor of Defendants Progress Energy Service Company, LLC and Florida Power Corporation and against Plaintiff Mindy Slater, to close this case, and to terminate any pending motions.

**DONE AND ORDERED** at Tampa, Florida, this 24th day of September, 2010.


SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of Record

19